United States District Court
District of Connecticut
FILED AT   NEW HAVEN
Aug. 30th 2017
Roberta D. Tabora, Clerk
By ____ 
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | Case No. 3:17 mj 1418 (WIG) |
|---|---|
| v. | FILED UNDER SEAL |
| FAREED KHAN | August 28, 2017 |

### AFFIDAVIT IN SUPPORT OF A COMPLAINT AND ARREST WARRANT

I, Christopher Evans, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent employed by the Department of Homeland Security (DHS) / Homeland Security Investigations ("HSI") and have been so employed since August 2008. Since January 2015, I have been assigned to the Federal Bureau of Investigation's Joint Terrorism Task Force ("JTTF"). Prior to this assignment, I attended the Federal Law Enforcement Training Center in Glynco, Georgia. Before joining HSI, I served as a Naval Officer in the United States Navy since March 1999. As a Special Agent with HSI, I have been involved in many investigations involving national security, including leading such investigations, applying for and executing search warrants, interviewing victims, interviewing suspects, and conducting arrests. I have gained experience through training in seminars, classes, and everyday work related to conducting these types of investigations. I have also conducted complex financial investigations and the debriefing of informants, cooperating witnesses, and defendants.

2. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States



Code, Section 2516. I am the co-case agent on the investigation which is the subject of this affidavit and have personally participated in the investigation concerning the violation of the federal law listed in this affidavit.

3. As a result of my participation and information received from other law enforcement officers, I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit. The statements contained in this affidavit are based on: (1) my personal participation in the investigation; (2) information provided to me by Special Agents of the Federal Bureau of Investigations ("FBI") and other law enforcement personnel; (3) information provided by witnesses and other sources of information, to include statements of the defendant; (4) records and documents obtained during the course of the investigation; and (5) my experience and training. Unless otherwise indicated, all conversations and statements described in this affidavit are related in substance and part.

4. Based upon the facts set forth below, and as a result of my personal participation in this investigation, I submit that there exists probable cause to believe, and I do believe, that FAREED AHMED KHAN has committed a violation of Title 18, United States Code, Section 1001(a)(2)(false statements).

5. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint and arrest warrant, I have not included each and every fact regarding this investigation. Rather, I have set forth only the facts necessary to establish probable cause to believe that KHAN has violated Title 18, United States Code, Section 1001(a)(2).



## THE DEFENDANT

6.     FAREED AHMED KHAN was born in Karachi, Pakistan on December 9, 1957. KHAN immigrated to the United States and subsequently became a Naturalized United States Citizen on February 21, 2003.  KHAN currently resides with his family in Connecticut.

## PROBABLE CAUSE

### I.     *Summary of the Investigation*

7.     As detailed below, through the course of the investigation, agents learned that: (A) the defendant expressed the belief that all Muslims should support jihad, including through fund-raising; (B) cash that exceeded his income regularly was deposited into the defendant's bank account, (C) this cash funded eBay accounts that were used to buy medical equipment that was selected by a person in Pakistan; and (D) the defendant shipped this medical equipment to Pakistan, falsifying the name of the intended recipient.

8.     In an effort to investigate what – if any – correlation existed between these facts, and to determine if they involved any terrorism-related activities or offenses, agents interviewed KHAN.  During the interview, agents asked KHAN about his affiliation with a certain Islamic charitable organization (hereinafter "the charitable organization"), a non-profit with which KHAN was deeply associated and for which he had fund-raised.

9.     Based on these aforementioned facts, the agents sought to determine through the investigation whether KHAN was embezzling funds from the charitable organization to purchase equipment, and whether the overseas shipment of that equipment was intended to support any terrorism-related activities or organizations.



10. When interviewed by FBI agents, KHAN denied any affiliation with the charitable organization and denied sending packages of medical equipment to Pakistan.

## II. *The Confidential Human Source*

11. In 2014, an FBI Confidential Human Source ("CHS") attended the charitable organization's "family day" event at an amusement park. There, the CHS observed KHAN working at a ticket counter wearing a distinctive scarf, which was identical to the scarves worn by Palestinians featured on the international news at the time who spoke out against the conflict with Israel. On one side of the scarf, there was an image of a holy mosque. On the other side, there was an image of the Israeli flag with a large "X" over it. KHAN was the only representative of the charitable organization wearing such a scarf.

12. The CHS asked KHAN why he wore such a scarf at a family event. KHAN advised the CHS that he was protesting against Israel and was very angry about what Israel has done to his fellow Palestinian Muslims. KHAN explained that the event provided him with a great opportunity to show all Muslim people that Muslims needed to take action against Israel and that Muslims should condemn Israel.

13. KHAN further explained to the CHS the need for all Muslims to support those who are fighting for Islam. KHAN stated in sum and substance that Islam says that if you cannot participate in jihad,[1] then you must support jihad with money, to help fund those who can

---

[1] It should be noted that the word "jihad" sometimes refers to an inner struggle, but is also used to refer to violence committed as part of a holy war. In this context, the CHS understood KHAN to be referring to violent jihad because (a) in providing his explanation, KHAN, who was speaking in Urdu, used the word "larta" when he spoke about

4



participate - - and that if you cannot help support with money, you must, in your mind and heart, hate all those who are against Islam. KHAN advised the CHS that he (KHAN) is not able to fight so he helps jihad through money and funding. While making this comment to the CHS, KHAN held up his hands with his palms up and looked to his left and right, gesturing to his surroundings, in a manner that suggested that he was using the money he collected at that day's event for his jihadi purposes.

  14. From August 2014 to August 2015, the CHS attended approximately fifteen of the charitable organization's events that were either led or attended by KHAN. During these events, the CHS noted that KHAN's involvement with the charitable organization appeared to be exclusively related to the collection of money. For example, in January 2015, one of the charitable organization's leaders told the CHS that KHAN was in charge of all money collections and had been in charge for a long time. In addition, during a regional meeting of the charitable organization in January 2015, KHAN told another member of the organization that he (KHAN) had personally raised $7,000 in cash through the charitable organization's 2013 back-to-school fundraiser that he (KHAN) had organized.

### III. *Analysis of KHAN's Bank Accounts*

  15. As part of the investigation, the FBI obtained records relating to Khan's bank accounts. The records revealed significant unexplained cash deposits. Specifically, the total cash

---

fighting and according to the CHS, that term means physical fighting and (b) KHAN made reference to a section of the Koran which is frequently used by radical Islamic extremists to justify violent jihad.



deposited from March 2007 through July 2015 was over $200,000, which averages out to approximately $25,000 annually. KHAN does not appear to have a legitimate source for these cash deposits. KHAN's primary source of income is from his job as a mechanic at an automobile service chain, for which he is paid by direct deposit biweekly and which amounts to approximately $34,000 per year.

16. Based on KHAN's statement at the charitable organization's family day event, FBI agents examined the cash deposits to determine if there was any correlation between the dates of the deposits and the dates of the charitable organization's events. There were only two occasions on which cash deposits appeared to correlate to the organization's events. Specifically, a 2014 family day event was held on August 2, 2014 and on August 31, 2014, $2,440 in cash was deposited into KHAN's account. Similarly, as indicated above, KHAN stated that he raised $7,000 during the charitable organization's 2013 back-to-school fundraising campaign. Your affiant is aware that this campaign generally begins in August before the school year and ends in September. A review of KHAN's bank records indicated that between August 16, 2013, and September 30, 2013, $7,000 in cash in four installments was deposited into KHAN's account (i.e., $2,500 on August 16, 2013; $1500 on September 16, 2013; $1,000 on September 25, 2013; and $2,000 on September 30, 2013).

17. Moreover, several of the deposits were made into KHAN's account from other parts of the country or world. Specifically, there were 13 deposits from November 2010 through August 2015 from outside of Connecticut, to include Texas, California and British Columbia.



18.     After reviewing KHAN's bank accounts, the FBI could not conclusively determine the source of the funds that were deposited, whether KHAN was embezzling funds from the charitable organization, or whether other people were depositing cash into KHAN's accounts.

## IV.  *Packages to Pakistan*

19.     The review of the cash deposits also revealed that much of that money appeared to fund two eBay accounts (hereinafter "eBay account-1" and "eBay account-2") via PayPal. A history of items purchased from these eBay accounts shows that more than 140 items were purchased between December 2012 and September 2015. Records indicate that the total for all items purchased was $49,040.31. A review of the descriptions of the items purchased revealed that all but eight of these items were apparent medical/surgical equipment. For example, on September 21, 2015, PayPal records show an "Olympus endoscope leakage tester" was purchased, and on March 3, 2015, an "Olympus GIF-1T140 Video Gastroscope Endoscopy Medical Equipment, Endoscope" was purchased.

20.     While KHAN paid for and received these items, the person who selected them was located in Pakistan and is believed to be an individual (whose name is known by your affiant) who resides at Near Islamia College, Karachi Sindh Pakistan 74800 (this individual hereinafter will be referred to as "Individual A"). The investigation revealed that a single Yahoo email address is registered to both eBay account-1 and eBay account-2, and that it is an active email account subscribed to by Individual A (hereinafter referred to as "the Individual A Yahoo account"). According to eBay records, the shipping address for both eBay account-1 and eBay account-2 is Individual A at KHAN's known residential address in Manchester, Connecticut (with the address

7



indicating that packages are to be addressed to Individual A "c/o" [in care of] KHAN). The eBay records also reveal that the IP address history for both eBay accounts resolve to both Manchester, Connecticut and Pakistan. Similarly, the investigation has revealed that the IP address history for the PayPal account associated with both eBay accounts indicates that the PayPal account has been accessed from both Connecticut and Pakistan.

21.     While the eBay items were sent to KHAN at his residence in Connecticut, KHAN repackaged them and sent them to Individual A in Pakistan. Records from the United States Postal Service ("USPS") show that, from 2010 through 2015, KHAN sent approximately 65 packages to Pakistan addressed to either of two names, which are known to your affiant, and which your affiant believes are false identities (hereinafter referred to as "Recipient-1" and "Recipient-2') at Near Islamia College, Karachi, Pakistan. This listed address is associated with Individual A. The FBI's review of postal records determined that KHAN listed "Hospital Equipment(s)" or "Miscellaneous Hospital Equipment" as the description for each of these 65 packages and that he provided the value of each package, with the aggregate reported value of all of the packages totaling $30,200.

22.     On May 15, 2015, the USPS intercepted two international parcels destined for Pakistan that KHAN had sent using his "Click-n-Ship" account. HSI conducted a border search of the international packages that were shipped from KHAN (listing his Manchester, Connecticut residential address) and addressed to Recipient-1 at the aforementioned Near Islamia College, Karachi, Pakistan address. On the Customs Declaration Dispatch Note, the importer's email address that was provided was the Individual A Yahoo account. The contents of the packages were

8



inspected and were found to consist of surgical endoscopy equipment, which was consistent with the "Misc. Hospital equipment's" description listed on the shipping label.

## V.   *KHAN's Interview with FBI*

23.   On or about June 26, 2015, KHAN responded to an FBI request for an interview. The FBI wanted an opportunity to talk to KHAN in the hopes that he would explain his relationship with the charitable organization, the various cash deposits made into his bank account, and his numerous shipments of packages to Pakistan.

24.   The FBI had recently interviewed one of KHAN's relatives in relation to telephonic contact that the relative had with an individual involved in an unrelated JTTF investigation. During that interview, the relative said that KHAN paid for his (the relative's) cell phone. The FBI told KHAN that they wanted to speak to him about this issue. KHAN agreed to the interview and arrived at the FBI office with a lawyer, who sat with him during the interview.

25.   At the beginning of the interview, KHAN was advised that the agents were conducting a counterterrorism investigation and that he could face criminal prosecution if he made intentional false statements during the interview. Both KHAN and his retained attorney acknowledged these admonishments and agreed to continue with the interview.

26.   Agents asked KHAN about the charitable organization. Specifically, they showed KHAN a news article concerning a woman who had been charged with providing material support to a terrorist organization and the article reported that the woman supposedly had previously received financial support from the charitable organization. The agents indicated that they would be interested in pursuing any individuals who would seek to defraud or exploit organizations like



the charitable organization by taking money from the organization for personal gain or in furtherance of criminal or terrorist activity.

27. In response to the agents' questions, KHAN stated, among other things, that he was not affiliated with the charitable organization or any of its subsidiaries, and was not involved or affiliated with any community or religious charities. KHAN further advised that he had never been employed by or volunteered for any charitable organization, to include the referenced charitable organization. In addition, KHAN stated that he was not aware of any office or representative of the charitable organization operating within Connecticut and that he did not maintain any association with anyone from the charitable organization. KHAN asserted that he had never collected any type of charitable donation on behalf of the referenced charitable organization or any other charitable organization.

28. Agents also asked KHAN about his ties to Pakistan. In this regard, they asked about any shipments that KHAN had sent to Pakistan. In response to these questions, KHAN stated that, with the exception of shipping items such as clothing to his Pakistan-based brother and sister (neither of whom is Individual A), he has never shipped any other item to anyone else in Pakistan.

### VI. *Federal Search of KHAN's Home, Phone and Facebook Account*

29. Knowing that these statements were false, the FBI continued its investigation and, on October 13, 2015, executed a federal search warrant upon KHAN's home, iPhone, and Facebook account.

30. During the execution of the warrant at his home, agents seized numerous items that confirmed KHAN's role in and association with the charitable organization. Specifically, agents

seized a variety of items and materials directly and specifically related to the charitable organization, including registration applications, documents/handbooks, vendor identification badges, promotional materials such as pens and lanyards, and representative samples of hundreds of flyers, banners and fundraising event advertisements.

31. The search of KHAN's cellular telephone revealed messages between KHAN and Individual A that corroborate their dealings, including the shipments of packages.

32. Specifically, in exchanges dated January 20, 2015 through January 22, 2015, KHAN and Individual A had the following exchange:

> FK:  2 boxes ship today under the name of [Recipient-1].
> IA:  …please send tracking detail Thanks.

33. Similarly, on April 17, 2014, Individual A wrote the following to KHAN: "Asmk…bythe grace of God parcel reached Pakistan today will be clear tomorrow Inshallah. will update later. … It is clearform custom they will hand over me Tomorrow Inshallah."

34. Likewise, on June 2, 2014, KHAN wrote to Individual A: "Let me know when you receive." During this exchange, KHAN provided the tracking number of three parcels shipped to the aforementioned address in Pakistan.

35. Communications recovered from KHAN's iPhone also indicated that he communicated with his brother on at least one occasion about a shipment he (KHAN) sent to Individual A. In addition, on one occasion in June 2015, KHAN asked Individual A to give his (KHAN's) brother one thousand dollars and Individual A agreed to do so and later confirmed that he had given money to KHAN's brother.

11



## VII. Conclusion

36. Based on the foregoing information, there is probable cause to believe, and I do believe, that FAREED KHAN has committed a violation of Title 18, United States Code, Section 1001(a)(2)(false statements). Accordingly, I request the issuance of a complaint and warrant authorizing his arrest.

### REQUEST FOR SEALING

37. I further request that the Court order that all papers in support of this application, including the affidavit and criminal complaint, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

CHRISTOPHER EVANS
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

Subscribed and sworn to before me on ____August 28____, 2017 at Bridgeport, CT.

/s/
THE HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

12

