UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO: 3:18CR195(JAM) |
| | : | |
| v. | : | |
| | : | |
| FAREED KHAN | : | Date:   November 22, 2019 |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S RULE 29 AND RULE 33 MOTIONS**

The Government submits this memorandum in opposition to the defendant Fareed Khan's omnibus motion for an order of acquittal or alternatively for a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33 respectively, filed on November 1, 2019 (Doc. #157). In support of both these motions, the defendant makes one argument: the government failed to prove that the defendant lied. Specifically, the defendant erroneously contends the government's case rested solely on the testimony of a single incredible and unreliable witness that was "inconsistent" with contemporaneous notes taken by another agent and "so inconsistent internally as to become too fragile to support a guilty verdict." (*Id.* at 8-13.)

Because the defendant misunderstands the standard of review applicable to Rule 29 motions, which requires this Court to view the evidence in the light most favorable to the government, and misconstrues the evidence presented at the trial, which unequivocally evidenced that the defendant lied about an extensive pattern of conduct and had a motive to do so, both of his motions should be denied in their entirety.

**I.     PROCEDURAL BACKGROUND**

On August 30, 2017, law enforcement arrested Khan pursuant to a federal criminal complaint and arrest warrant. On September 6, 2018, a grand jury in the District of Connecticut

returned an indictment charging the defendant with making materially false, fictitious, and fraudulent statements in a matter involving international and domestic terrorism, in violation of Title 18, United States Code, Section 1001(a)(2). The single count indictment read as follows:

> On or about June 26, 2015, in the District of Connecticut, in a matter involving international terrorism as defined in Title 18, United States Code, Section 2331, within the jurisdiction of the executive branch of the Government of the United States, that is, the Federal Bureau of Investigation (FBI), the defendant, FAREED AHMED KHAN, did knowingly and willfully make materially false, fraudulent, and fictitious statements and representations, to wit:
>
> (1)     He was not affiliated with the Islamic Circle of North America ("ICNA"), ICNA Relief, Helping Hands, or the Helping Hand for Relief and Development;
>
> (2)     He had no personal association with ICNA;
>
> (3)     He did not know anyone from ICNA;
>
> (4)     He had no idea how charities such as ICNA work and was not aware if they collected cash, checks or other material goods for individuals in need;
>
> (5)     He had never collected any type of charitable donations for ICNA or any other charitable organization; and
>
> (6)     The only packages he has ever sent to Pakistan were to his sister and brother and contained clothing.
>
> All in violation of Title 18, United States Code, Section 1001(a)(2).

Indictment at 1-2 (Docket No. 58). Prior to trial, the Government voluntarily dismissed the terrorism enhancement, proceeding on the false statement charge alone.   At trial, the government studiously avoided any reference to terrorism, and no such evidence was presented to the jury.

On September 5, 2019, the parties selected a jury and commenced evidence on September 16, 2019.   Following the close of the Government's case, the defendant moved pursuant to Federal Rule of Criminal Procedure 29 for acquittal, alleging that the government had failed to meet its

burden of proof. The Court reserved judgement on the motion. The trial concluded in the afternoon on September 18, 2019, and the jury returned its guilty verdict on September 19, 2019. The jury, which had been provided with a special verdict form, rendered a decision as to only one of the six misrepresentations listed in the indictment. Specifically, they found that the defendant had intentionally and knowingly made the following misrepresentation to the FBI: The only packages he has ever sent to Pakistan were to his sister and brother and contained clothing.

## II.    FACTUAL BACKGROUND

Prior to the interview at the heart of this case, an FBI task force, which included IRS Special Agent Michael Dragan, FBI Special Agent Keith Hall, and Air Marshal Thomas Gannon, among others, began an investigation of the defendant as are result of the defendant's suspicious "international money movements." (Dragan at 9.) The agents suspected that the defendant might be engaging in, among other things, trade-based money laundering and illegal money remitting. Specifically, the investigation showed that significant amounts of cash were being deposited into the defendant's bank account from various States and that a significant portion of the money was being used to purchase used medical equipment on eBay. That medical equipment was shipped to the defendant's home in Connecticut, where he repackaged it and shipped it to Pakistan at the direction of a man named Hussain Chippa. While destined for Chippa, the packages were not addressed in his name.

In its case-in-chief, the government introduced records associated with the defendant's bank and PayPal accounts as well as an eBay account accessed by the defendant and others. (Government Exhibits ("GX") 1-2, 4-8.) Through SA Dragan, the government introduced a summary chart, demonstrating that from 2007 through 2015, $206,700 in cash had been deposited

into one of the defendant's bank accounts. (GX14.) As SA Dragan testified, the cash deposits "appeared inconsistent with his vocation as an auto mechanic and getting paid wages." (Dragan at 9.) Of that money, $157,832.91 had been transferred to another bank account belonging to the defendant, and then $126,562.79 had been debited from that account by PayPal. (GX14.) The PayPal account was subscribed to a man named Hussain Chippa and the eBay account was subscribed to Shak Khan. (GX4 & 7.) The PayPal debits from the defendant's bank account largely went to purchase used medical equipment, which was sent to the defendant's home in Connecticut. (GX5 & 8.)

The government also introduced records from the United States Postal Service related to the defendant's Click-N-Ship account. (GX15.)   As these records demonstrated, Mr. Khan had previously sent over sixty packages to one of two recipients, both at the same address in Karachi, Pakistan over the past seven years. (*Id.*). The government further introduced evidence that on May 15, 2015, members of the task force from Homeland Security Investigations and a representative from the United States Postal Inspection Service pulled aside two Priority Mail packages from the Manchester, Connecticut Post Office. The packages were sent by "Fareed Khan, of Manchester, Connecticut," and were addressed to a party in Karachi, Pakistan.   HSI Special Agent and Task Force Officer Christopher Evans opened the packages and found used medical equipment inside. (GX17-26.)

Based on this evidence, the agents suspected that the defendant's conduct "could have been money laundering. It could have been unlicensed money remitting. We weren't sure." (Dragan at 40.) As SA Dragan explained, after receiving this evidence, the agents wanted to talk to the defendant. (*Id.* at 52-53.) At this point, SA Hall contacted Peter Goselin, Esq., a lawyer for Mr.

Khan, and asked to arrange a meeting. (Gannon at 9.) Goselin was not informed about the task force's purpose in conducting the interview. (*Id.*) Task Force Officer Gannon testified that he was assigned to the defendant's investigation as a member of the task force and that he participated in the interview along with SA Hall. (*Id.* at 8-9.) He further testified that he and SA Hall wanted to cover specific topics during the interview. Specifically, "[t]here was questioning about money sent overseas. There was also a questions about materials and other things that could be sent overseas." (*Id.* at 11.)

On June 26, 2015, Mr. Khan and Attorney Goselin arrived at the FBI Office in New Haven, Connecticut and met with SA Hall and TFO Gannon in an interview room on the second floor. (*Id.* at 11-2). When the defendant and his attorney arrived, the agents "showed Mr. Goselin and Mr. Khan our credentials. And we proceeded to thank them for coming in and tell them this was an interview with the FBI, of course, and that being truthful was very important, of the utmost importance. And if you were to lie during this interview, that might be prosecutable by the U.S. Attorney's Office." (Id. at 13.) The agents also explicitly told the men that "they were able to speak privately if there was any questions that they couldn't answer in front of us or needed some time to discuss before they answered us or if they answered us." (*Id.* at 13-14.)

SA Hall questioned Mr. Khan and TFO Gannon observed the interview, analyzing Mr. Khan's behavior during the interview, which was conducted in English. (*Id.* at 13.) SA Hall took notes and wrote a 302 report that same day. (*Id.* at 65, 153; DX 1 (302 of SA Hall and TFO Gannon for identification only); DX 2 (notes of SA Hall).) Those five pages of notes, taken on an investigator notepad, were entirely written in shorthand by SA Hall. The last page of the notes reflect that the defendant was asked about packages to Pakistan.  Specifically, the notes read as

follows:

> Pak
>> Ship U.S.P.S. bro/sis
>> Nothing taken or diverted
>> Western union $0
>> Pak $0

(DX2.) TFO Gannon reviewed SA Hall's report to ensure that it was accurate and signed it, adopting it as his own. (*Id.* at 65-66.)

During the interview, SA Hall "asked Mr. Khan if he had ever sent any kind of packages or materials overseas." (*Id.* at 24.) Mr. Khan replied that he had, but "it was to his brother and sister in Pakistan" and that the packages consisted of clothing. (*Id.* at 24-25; 86; DX 2.) SA Hall then "followed up" and asked Mr. Khan "if he had any knowledge of anybody sending any packages or materials to Pakistan," and Mr. Khan replied that "he didn't and that he only had the clothing that he had sent there." (*Id.* at 25.)

Following this interview, the agents broadened their investigation to include additional investigative steps. (Dragan II at 5.) On October 13, 2015, agents executed a search warrant on Mr. Khan's residence. (Gannon at 26-27.) Among the items found in a detached garage were U.S. postal boxes, including a parcel shipped to Hussain Chippa, c/o Fareed Khan, 30 Hudson Street, Manchester, Connecticut. (*Id.* at 32; GX 50.) In the basement of Mr. Khan's residence, agents found medical devices and equipment. (*Id.* at 33; GX 55.)

During the execution of the search warrant, Mr. Khan explained to TFO Gannon and SA Hall that Mr. Chippa ordered items from eBay and had them shipped to Mr. Khan's house, where Mr. Khan would repackage the ordered items and send them to Chippa in Pakistan. (*Id.* at 58.) Mr. Khan explained that he did not know how Chippa paid for the ordered items, but that persons who

Mr. Khan did not know "would put money into his account at Bank of America." (*Id.* at 59.) For his role in the arrangement, the defendant "received payment from Mr. Hussain Chippa. Sometimes Mr. Khan would ask Mr. Chippa to give money to Mr. Khan's family located in Pakistan, Pakistan being where Hussain Chippa was." (*Id.*) The defendant "referred to that as a hawala or hawaladar." (*Id.*)

The government also introduced WhatsApp exchanges between the defendant and Chippa seized pursuant to the search warrant from the defendant's phone. (GX32.)   The implication from these chats was that Khan was facilitating Chippa's hawala. In those exchanges, Chippa informed Khan when deposits were made into Khan's bank account and requested information from Khan concerning the mailing of packages to Chippa. (*Id.*) Several of those exchanges corresponded with out-of-state cash deposits into the defendant's account. (*Id.*; GX1D; Dragan II at 13-14.) The exchanges also evidenced that the defendant specifically asked Chippa to provide money to his brother in Pakistan, which Chippa did. (GX32.) Moreover, the chats showed that Chippa asked the defendant "any one wants to send money please do let me know" and that just a few days later, the defendant received and was coordinating a transfer of money from a person within the United States at Chippa's direction. (*Id.*)

The government then introduced and read a stipulation that provided the jury with the definition of a hawala. (GX38.) In that stipulation, the parties agreed that "operating a hawala can be illegal in some instances from a regulatory stand point in some United States jurisdictions" and that "[m]any South Asian nations (such as Pakistan and India) have laws that prohibit speculation in the local currency, prohibit foreign exchange transactions at anything other than the official rate of exchange, and impose strict licensing requirements on money remitters and foreign exchange

dealers." (*Id.*) The parties also agreed that "sometimes hawala can play, and at times has played, a role in money laundering and other crimes.   In the case of hawalas, this is because hawalas can operate without complying with anti-money laundering and know-your-customer regulations applicable to traditional banking institutions." (*Id.*)

On cross-examination, the defendant fully explored TFO Gannon's memory. In response to defense counsel's questions about whether he remembered the interview, TFO Gannon stated "I would say my knowledge or remembrance is pretty accurate given that it wasn't something that was always common." (Gannon at 63.) When asked if it was "difficult" for him to remember "the specific details of a conversation that took place four years ago," TFO Gannon stated "I would say that it would be very – it would be difficult to remember specific minute details, but I do remember the conversation." (*Id.* at 129.)

TFO Gannon further reiterated that he and SA Hall "asked Mr. Khan if he ever ships anything to Pakistan" and if the defendant "ever sent anything or shipped anything outside the United States." (*Id.* at 84-85 and 148.) While TFO Gannon acknowledged that he was not "a hundred percent sure" if SA Hall had used the exact words "had he ever sent anything or shipped anything outside the United States" because "it could be off a few words," he specifically noted that the questions posed to the defendant were "to the effect of have you ever sent any items overseas." (*Id.* at 148.) Reviewing SA Hall's notes during the interview, TFO Gannon stated that the notes reflect that the defendant stated that he shipped packages to "Pak", which TFO Gannon understood to mean Pakistan, to his "bro/sis", which TFO Gannon understood to mean the defendant's brother and sister. (*Id.* at 86.) TFO Gannon was certain that Mr. Khan "denied sending packages to Pakistan that contained something other than clothing to his brother and sister," but

he could not "repeat to you the exact question asked." (*Id.* at 155-56.)

As relevant to the instant motion, the defense called one witness: Peter Goselin. Goselin testified that he is a labor and employment lawyer, who has never practiced as a criminal law attorney. (Goselin at 4.) Goselin was introduced to Fareed Khan by a mutual friend in the Fall of 2015; the friend asked Goselin to attend the interview with Mr. Khan. (*Id.* at 5.)   Goselin was unsure about how he learned that the FBI wanted to interview Mr. Khan, believed that the interview took place in October in the Fall of 2015, and did not believe the FBI warned Mr. Khan to lie was a federal crime. (*Id.* at 24, 5-6, and 25.) When confronted with the fact that the interview occurred in June, Goselin stated "I recollect the year but, you know, it was four years ago." (*Id.* at 6.) Nonetheless, Goselin testified he personally advised Mr. Khan that a false statement to the FBI could be a federal crime. (*Id.* at 26.) Goselin, as Mr. Khan's representative, neither asked that the FBI record the interview nor asked that they provide a translator for Mr. Khan because "it wasn't necessary." (*Id.* at 25.) Instead, during the hour to hour and a-half interview, Goselin took two to three pages of notes, some verbatim and some intended to jog his memory in the future, which included "doodling;" Goselin's notes did not follow his "usual practice" of denoting who was present at the interview. (*Id.* at 27-28.) Most notably, he did not "record the questions that were being asked." (*Id.* at 27.) Nonetheless, Goselin recalled that the FBI agents asked Mr. Khan "if he sent packages to his parents [in Pakistan], and he said no. And I believe he volunteered that he sent packages to his sister and his brother. There was no further discussion on that topic." (*Id.* at 18.)

Goselin initially stated that he had "no bias towards the FBI" (*id.* at 22), but then acknowledged using his Twitter account in 2018 to send the message:  "While the president praises white supremacists, the FBI (for folks in the back row, NOT OUR FRIEND) is targeting

'Black Identity Extremists' with surveillance and arrest." (*Id.* at 55; GX 66.) Goselin also acknowledged sending a tweet on December 28, 2015 that read: "Gunning down 12 year old boys is now 'reasonable.' Never mind ISIS, the real terrorists in the U.S. wear badges," but explained that he nonetheless was willing to be hired by police officers as part of his legal practice. (*Id.* at 57 & 67; GX 67.) Goselin concluded his testimony by saying "I think that there's a really serious problem with the extent to which the FBI surveils and targets the Muslim community in the United States and treats them as if they are criminals simply because they are Muslims." (*Id.* at 68.)

## III.   DISCUSSION

### A.   *Khan's Rule 29 Motion Should be Denied*

In challenging the sufficiency of the evidence in his Rule 29 motion, the defendant challenges a single element: the misrepresentation.   In so doing, he fashions an argument that the government's case rests a single witness – TFO Gannon – whose testimony was inconsistent and unreliable.   This argument discredits TFO Gannon's testimony and disregards the other evidence in this case that established a motive for the defendant to lie and the effect that the lie had on the FBI's investigation.   By so doing, the defendant ignores the standard of review and the evidence presented by the jury. When viewed by the correct standard, there was more than sufficient evidence on which any rational juror could convict the defendant, and hence his Rule 29 motion should be denied.

When the defendant challenges the sufficiency of the evidence, a defendant bears a "very heavy burden." *United States v. Biday*, 804 F.3d 558, 572 (2d Cir. 2015); *see also United States v. Parkes*, 497 F.3d 220, 225 (2d Cir. 2007). Therefore, when deciding a Rule 29 motion for acquittal, the Court must view all evidence in the light most favorable to the government and credit every

inference that the jury may have drawn in favor of the government and view proof in the light most favorable to the government. *United States v. Silver*, 864 F.3d 102, 113 (2d Cir. 2017); *United States v. Downing*, 297 F.3d 52, 56 (2d Cir. 2002).

"[T]he law draws no distinction between direct and circumstantial evidence" and "[a] verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability drawn from the circumstantial evidence are reasonable." *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005). Because there is rarely direct evidence of a person's state of mind, "the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom." *Id.* at 189; *see also United States v. Crowley*, 318 F.3d 401, 409 (2d Cir. 2003). Indeed, "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences." *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008).

In this regard, the Court may not assess witness credibility, resolve inconsistent testimony against the verdict or otherwise weigh the significance of the evidence. *Parkes*, 497 F.3d at 225; *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000). The jury is "exclusively responsible" for determinations of witness credibility and is free to credit all or part of the testimony of a given witness. *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993).

Further, "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence."  *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003); *Best*, 219 F.3d at 200. "Viewing the evidence in the light most favorable to the government means 'crediting every inference the jury might have drawn in favor of the government,' and recognizing that the government's evidence need not exclude every other possible hypothesis." *United States*

*v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (citations omitted). When there are competing inferences, courts "must defer to 'the jury's choice.'" *Id.* (quoting *United States v. Morrison* 153 F.3d 34, 49 (2d Cir. 1998). Therefore, in presenting its evidence, the government need not disprove every reasonable hypothesis consistent with the defendant's innocence. *Strauss*, 999 F.2d at 696. Moreover, a jury's decision to convict may be based solely on circumstantial evidence and any reasonable inferences based upon the evidence. *Wexler,* 522 F.3d at 207.

In short, a court may not disturb a conviction on grounds of legal insufficiency as long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Hawkins*, 547 F.3d at 70 (internal citations and quotation marks omitted). "The ultimate question is not whether <u>we believe</u> the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether <u>any rational trier of fact could so find</u>." *United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998) (emphasis in original). The Second Circuit has made clear that the strict Rule 29 standard is "necessary to avoid judicial usurpation of the jury function." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984). "It is irrelevant that the judge conducting such a review personally feels that he or she would not have found guilt upon such evidence."  *United States v. Espaillet*, 380 F.2d 713, 718 (2d Cir. 2004).   Rule 29 thus must not be used as a vehicle for the trial court to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn from the evidence for that of the jury. *United States v. Guadanga*, 183 F.3d 122, 129 (2d Cir. 1999); *Mariani*, 725 F.2d at 865.

Viewed under these standards, there was ample evidence to convict Mr. Khan of falsely claiming that the only packages he has ever sent to Pakistan were to his sister and brother and contained clothing. Simply put, TFO Gannon stated that on June 26, 2015, he and SA Hall, both

members of an FBI task force, met with Mr. Khan and his attorney, Peter Goselin. The agents identified themselves as working for the FBI and advised Mr. Khan that a false statement to the FBI could lead to a federal prosecution for lying to the FBI. When SA Hall "asked Mr. Khan if he had ever sent any kind of packages or materials overseas," Mr. Khan replied that he had, but "it was to his brother and sister in Pakistan" and that the packages consisted of clothing. (*Id.* at 24-25; 86; DX 2.) Mr. Khan denied sending any other packages to Pakistan. (*Id.*)

The Government's evidence also proved that Mr. Khan's response was false. Postal Inspector Lindbergh explained to the jury how in May 2015, the month before the interview, he had held two packages Mr. Khan mailed from his Manchester Post Office to Pakistan, and how he had been present when SA Evans opened the packages. PI Lindbergh also explained Government's Exhibit 15, which listed the numerous packages Mr. Khan had sent to Pakistan over a number of years, all of which Mr. Khan had claimed contemporaneously to contain medical equipment.

Mr. Khan's statements to TFO Gannon and SA Dragan on October 13, 2015 also show that Mr. Khan's lie on June 26, 2015 was willful and intentional. When confronted during the search warrant with packages addressed to Hussein Chippa, Mr. Khan admitted that he had been sending packages to Pakistan for some time. PI Lindbergh's testimony and the Government's exhibit documenting Mr. Khan's Click-N'-Ship account demonstrated that Mr. Khan had sent packages to Pakistan not only a month before his FBI interview, but for years leading up to the interview.

Although motive is not an element of a successful 1001 prosecution, the government further admitted evidence that the defendant had a motive to lie. *See United States v.* Rodgers, 466 U.S. 475, 478 (1984)("In 1934, Congress deleted the requirement of a specific purpose and enlarged the class of punishable false statements to include false statements made 'in any matter

within the jurisdiction of any department or agency of the United States'")(citing Act of June 18, 1934, ch. 587, 48 Stat. 996). As the defendant's post-arrest statement and his communications with Chippa make plain, the defendant as assisting Chippa's operation of a hawala. Given the sheer volume of money moving into and out of Khan's account to this end, it stands to reason that he did not want to discuss his mailings to Chippa – all of which were financed by the cash deposits – with the FBI.

Faced with all this evidence, the jury could – as they did – reasonably conclude that Mr. Khan was aware that he had been sending packages to Pakistan and that he made a conscious decision to deny falsely that fact in his June 26, 2015 interview.

In his Rule 29 motion, Mr. Khan makes numerous attacks on TFO Gannon's testimony that are wholly inconsistent with the standard of review. Most of these attacks bear on TFO Gannon's memory and credibility, which the defendant similarly attacked at trial. The jury considered all the resulting testimony, and determined that TFO Gannon was credible and reliable. Because this Court must view all evidence in the light most favorable to the government and credit every inference that the jury may have drawn in favor of the government, the defendant's credibility arguments do not meet his extremely heavy burden.[1]

In a failed effort to meet that burden, Mr. Khan attempts to analogize his case to those where the government's evidence, viewed in the light most favorable to the government, is ambiguous or inconsistent as to whether the defendant lied. In so doing, Khan contends that TFO Gannon was inconsistent because on direct he testified that Mr. Khan made the false statement in

---

[1] With respect to the defendant's credibility arguments, the government addresses those arguments in its opposition to the defendant's motion for a new trial.

response to a question about whether he had sent packages to Pakistan whereas he later testified on cross-examination that the question posed had been whether Mr. Khan had ever shipped anything outside of the United States. (*Id.* at 11.) Mr. Khan argues that because TFO Gannon "did not remember the exact question asked . . . [t]hat alone is enough for a judgment of acquittal." (*Id.* at 9.)

The cases cited by the defendant, however, are inapposite. In each case, the answers provided by the defendants were literally true or could be true depending on the question asked, and the government either (1) failed to present any evidence as to the questions posed or (2) presented evidence that the question asked was ambiguous or was wholly inconsistent with transcripts of the interview. *See Bronston v. United States*, 409 U.S. 352, 354 & 358-59 (1973)(reversing the defendant's conviction for perjury where the government's evidence showed that the question asked was ambiguous and the answer provided was facially true and only false by implication); *United States v. Clifford*, 426 F. Supp. 696, 705 (E.D.N.Y. 1976) (granting the Rule 29 motion where there was "no evidence… presented on the question"); *United States v. Poutre*, 646 F.2d 685, 688 (1st Cir. 1980)(reversing the false statement conviction where the testimony of the agent was "not replicated either at all or very substantially in the one opportunity to record what was actually said, and, as to one item, not even recorded his own wrap-up memorandum").

Here, the government's evidence, viewed in the light most favorable to the government, shows that agents asked the defendant about mailing packages outside the United States or about mailing packages to Pakistan. Moreover, when the defendant answered that he sent packages of clothing to his brother and sister, the agent "followed up" and further asked if he sent "any

packages or materials to Pakistan. Mr. Khan said that he didn't and that he only had the clothing that he had sent there." (Gannon at 25.) Whichever of the two questions was asked, whether limited to Pakistan or more broadly outside the United States, Mr. Khan's response that the only packages he sent to Pakistan were to his brother and sister and contained clothing was palpably false in light of the fact that he had sent numerous packages containing medical equipment to Pakistan for years.

Moreover, SA Hall's notes are not inconsistent with testimony. Unlike the cases cited by the defendant, SA Hall's notes were not a verbatim record of the interview. They were intended to jog his memory when he subsequently wrote his report, which he did that same day and which TFO Gannon reviewed and signed at the time and reviewed in anticipation of his testimony in Court. Additionally, the notes make plain that the defendant was asked about packages to "Pak" and that the only answer provided was that he sent clothing to brother and sister.

In this regard, this case is more analogous to *Neely v. United States*, 300 F.2d 67 (9th Cir. 1962). In that case, the Court of Appeals affirmed the defendant's false statement convictions where the government presented a single law enforcement witness to testify about the misrepresentations. In that case, the defendant had testified he had not been asked the question that led to his alleged false statement, and the other witness present at the interview had testified that he had no recollection of the question. The defendant argued that because the government's witness was uncorroborated and contested, the government had not met its burden of proof. The Court rejected this argument, holding that a false statement case may be proved by a single witness and "[o]ne witness' oath is not as good as another's if the jury disbelieves the one and believes the other." *Id.* at 70. The Court further noted that "the individual witness' credibility is subject to the scrutiny of court and jury, and such testimony is not be held insufficient to prove the fact merely

because the defendant denies the truth of the testimony." *Id.* at 71; *see also United States v. McCue*, 301 F.2d 452, 456 (2d Cir. 1962)(a single witness' testimony is sufficient to support a 1001 conviction).

Like the government in *Neely*, the government here presented evidence of the questions and the defendant's false answer. The defendant vigorously contested this evidence at trial, making all of his current arguments to the jury. The jury rejected them. Moreover, the fact that TFO Gannon said there will always be a doubt as to the exact wording of the question asked does not eradicate the reasonableness of the jury's verdict. (Doc. 157 at 11.) To be sure, on cross-examination, TFO Gannon stated that he was not "a hundred percent sure" if SA Hall had used the exact words "had he ever sent anything or shipped anything outside the United States," but TFO Gannon explained that he was not a hundred sure because "it could be off a few words." (Gannon at 148.) TFO Gannon never said he had any doubt as to the content or message of SA Hall's question.   Nor did TFO Gannon express any doubt as to Mr. Khan's false answer.   To the contrary, TFO Gannon explained that he was certain that Mr. Khan "denied sending packages to Pakistan that contained something other than clothing to his brother and sister," but he could not "repeat to you the exact question asked." (*Id.* at 155-57.)[2]

Moreover, contrary to the defendant's contention, reversal is not required because there was no audio or video recording, or a verbatim transcript of the interview. (Doc. 157 at 7.) As Mr.

_____

[2] Mr. Khan attempt to twist TFO Gannon's testimony to "merely stat[ing] that he was certain that Mr. Khan denied sending anything other than clothing to his brother and sister," Doc. 157 at 12, is based on inferences made in the light most favorable to him, thus ignoring the standard of review. The record makes plain that SA Hall asked either if Mr. Khan "had any knowledge of anybody sending any packages or materials to Pakistan," to which Mr. Khan replied that "he didn't" other than "the clothing he had sent there" (Gannon at 25) or that SA Hall "asked Mr. Khan had he ever sent anything or shipped anything outside the United States" to which Mr. Khan replied that "the only packages he has ever sent to Pakistan were to his sister and brother and contained clothing" (*Id.* a 147-48).

Khan recognizes, *id.*, a verbatim account of an interview is not required to satisfy the Government's burden of proof under 18 U.S.C. § 1001. *See, e.g., Poutre*, 646 F.2d at 688 (1st Cir.1981)( "[w]e do not hold that a verbatim transcript or written statement is required per se in prosecutions under § 1001"); *United States v. Poindexter*, 951 F.2d 369, 388 (D.C. Cir.1991) (rejecting defendant's motion to dismiss § 1001 count for failure to maintain verbatim transcript and stating that "[t]he absence of such formal trappings [the administration of an oath and the existence of a verbatim transcript] is relevant, of course, to the difficulty of proving beyond a reasonable doubt exactly what the defendant said and whether he intended to deceive his audience as to a material question of fact; but these are issues of the sufficiency of the evidence in a particular case, not reasons for carving a categorical exception from the statute").

Perhaps more importantly, however, Mr. Khan was represented at the interview by a counsel of his choosing and that legal counsel did not ask that the meeting be recorded or transcribed.   That counsel may have had his own strategic reasons for not seeking a recording, including hoping to later accuse the FBI agents of lying against a Muslim to show the world that the FBI treats Muslims badly and to further his own standing among his political constituency. But his strategic decision should not be used as a reason to overturn the verdict for lack of a verbatim record, especially since Mr. Khan's counsel was taking notes.

In short, the trial testimony and evidence makes very clear that the jury's determination of Mr. Khan's guilt of making a false statement to the FBI was concluded in accordance with the law on such matters.

### B. Khan's Rule 33 motion should be denied

Obviously unhappy with the jury's verdict, Mr. Khan also attacks the weight of the

evidence. He urges this Court to order a new trial in the interests of the justice because the jury rejected his arguments against the Government's case. Specifically, the defendant primarily attacks the memory and credibility of TFO Gannon in effort to undercut the strength of TFO Gannon's testimony, and argues that the testimony of his own witness, Peter Goselin, proves that the defendant did not lie to the FBI.   As the discussion herein and in the Government's response to the Defendant's Rule 29 motion demonstrates, Mr. Khan received an eminently fair trial.   In short, the interests of justice do not militate in favor of a new trial.

When considering such a motion, the district court must "'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *Aguiar*, 737 F.3d at 264). Thus, before granting a Rule 33 motion, the court "must harbor a real concern that an innocent person may have been convicted." *United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015) (*per curiam*) (internal quotations omitted). In short, the authority to grant a new trial under Rule 33 should be used "sparingly and in the most extraordinary circumstances." *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008) (internal quotations omitted).   In the context of a motion for a new trial under Rule 33, the Second Circuit instructs trial judges:

> It long has been our rule that trial courts must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.   *It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment*.   Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation.   But the trial judge's rejection of all or part of the testimony of a witness or witnesses does not automatically entitle a defendant to a new trial.   The test is whether it would be a manifest injustice to let the guilty verdict stand.   Manifest injustice cannot be found simply on the basis of the trial judge's

determination that certain testimony is untruthful, unless the judge is prepared to answer "no" to the following question: "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?"   In making this assessment, the judge must examine the totality of the case.   All the facts and circumstances must be taken into account.   An objective evaluation is required.   There must be a real concern that an innocent person may have been convicted.   It is only when it appears that an injustice has been done that there is a need for a new trial "in the interest of justice." Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed.R.Crim.P. 29, where the truth of the prosecution's evidence must be assumed, that discretion should be exercised sparingly.

*United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). (emphasis added, internal quotation marks and citations omitted) (reversing the grant of a new trial based on the district court's conclusion that the convictions were not supported by the weight of the evidence).

While Rule 33 contemplates that a court may evaluate the weight of the evidence and the credibility of the witnesses, it is well-settled that only in "exceptional circumstances" should the jury's credibility assessment and guilty verdict be discarded.  *Id.* at 1413.   Even if a court does conclude that a Government witness was not credible, the court should not grant a new trial unless it would be a "manifest injustice" to let the verdict stand, i.e., where, in light of the record as a whole, there is "a real concern that an innocent person may have been convicted." *Id.*

The defendant has utterly failed to meet the standard for a new trial. As discussed in the response to Mr. Khan's Rule 29 motion, the evidence against Mr. Khan was strong. In the face of a jury verdict, which rejected his attack on TFO Gannon's credibility, Mr. Khan asks this Court to dissect TFO Gannon's testimony and find inconsistencies when none exist. The defendant contends that TFO Gannon's testimony concerning the questions asked and answers provided was unreliable because TFO Gannon had left the task force, did not take notes, and had participated in

hundreds of interviews and worked thousands of flights since the time of Mr. Khan's first interview. (Doc. 157 at 8.) In making this argument, however, Mr. Khan ignores TFO Gannon's repeated testimony that he recalled the salient details of the interview. That is in part because although SA Keith Hall prepared the report of the interview the same day as the interview itself, TFO Gannon "reviewed the report to make sure that what Agent Hall wrote was accurate." (Gannon at 65.) Not only did TFO Gannon review the report, but he signed it, adopting it as his own. (*Id.* at 66.) Moreover, as demonstrated on cross-examination, at the time he testified, former TFO Gannon was familiar with the contents of SA Hall's 302 report. (*Id.* at 89; DX 1 (for identification only).) In light of his familiarity and concurrence with the report of interview, which was drafted the very day of the interview, there is no reason to doubt that TFO Gannon's testimony was accurate despite the passage of time and the numerous interviews that he had conducted since his first interview of Mr. Khan. Moreover, TFO Gannon said himself that he remembered the interview because it was unusual.

Nor was Mr. Khan's response that he had not sent anything or shipped anything to Pakistan easily forgettable. As the testimony and evidence introduced at trial showed, the FBI was investigating the defendant specifically for his unusual money movements and mailings vis-à-vis Pakistan. Their purpose in interviewing him was to further explore these activities. Hence, prior to the interview, they knew about his extensive shipments to Pakistan. They were specifically focused on this subject. And their conduct following the interview lent ample support to TFO Gannon's testimony that Mr. Khan had lied about his history of sending packages to Pakistan in the June 26, 2015 interview. In light of SA Dragan's testimony at trial that the investigation into Mr. Khan increased in scope and agents began drafting a search warrant affidavit *after* the interview, the jury

was entitled to infer that the increased scrutiny of Mr. Khan was the result of a lie.

The fact that Mr. Khan admitted to TFO Gannon just three months later, during the execution of the search warrant that revealed numerous packages addressed to Hussein Chippa in Mr. Khan's house, that he did send packages to Pakistan provided further reason for TFO Gannon to recall Mr. Khan's bald-faced false statement. It is hardly surprising that an agent would not forget uncovering direct evidence that the target of his investigation had lied. Under such circumstances, there was no reason for the jury to question TFO Gannon's recollection of the interview. Thus, there is no reason to overturn the jury's determination that Mr. Khan knowingly and willfully had lied when he told SA Hall and TFO Gannon that he had not mailed any packages to Pakistan save clothing to his brother and his sister.

And, as noted above, even if the case was "weak" – which it was not – Goselin's biased and false testimony "transform[ed] the evidence in this case from borderline to sufficient." *United States v. Velasquez*, 271 F.3d 364, 374 (2d Cir. 2001). Thus, even Mr. Khan's attempt to paint the case against him as a one-witness case, which would have been perfectly proper, is factually incorrect on so many levels. Indeed, although Mr. Khan was not required to put forward evidence, he chose to do so. Of course, a defendant who presents a defense case "waives any claim as to the sufficiency of the Government's case considered alone." *United States v. Pui Kan Lam*, 483 F.2d 1202, 1208 n.7 (2d Cir. 1973). The jury was entitled to evaluate the evidence he put forward and "to conclude that [the defendant's] version of the events was false and thereby infer [the defendant's] guilt." *United States v. Friedman*, 998 F.2d 53, 57 (2d Cir. 1993); *see also United States v. Spencer*, 129 F.3d 246, 251 (2d Cir. 1997)(jury may rely on their disbelief of defense witness "if independent evidence supports the government's case"). Here, Peter Goselin testified

that FBI agents asked Mr. Khan "if he sent packages to his parents [in Pakistan], and he said no. And I believe he volunteered that he sent packages to his sister and his brother. There was no further discussion on that topic." (*Id.* at 18.)

But Goselin, as this Court noted, sent tweets that were "very clear evidence of bias by Mr. Goselin against the FBI and law enforcement." (Goselin at 44.) Moreover, Mr. Goselin added further reason to doubt his veracity when he, unsolicited, opined that "the FBI surveils and targets the Muslim community in the United States and treats them as if they are criminals simply because they are Muslims." (*Id.* at 68.) In light of Goselin's agenda and palpable bias against the FBI, the jury was entitled to infer that Mr. Khan had retained this particular labor lawyer because he knew that his biases would lead him to testify falsely in Mr. Khan's defense.

Moreover, vis-à-vis TFO Gannon, Goselin was poorly situated to recall the details of this interview. TFO Gannon had investigated the defendant for some time prior to the interview, knew the interview's agenda, reviewed and adopted a report fully documenting the interview the same day as the interview, and relied on the content of the interview in shaping his continued investigation.   By contrast, Goselin only represented the defendant for this one brief encounter with no true understanding of the interview's purpose and only doodled a few notes that were never flushed out into a more fulsome memorandum. Given these facts, it is imminently reasonably that the jury would credit TFO Gannon's testimony.

In short, Mr. Khan received an eminently fair trial.   The Government voluntarily held back evidence about terrorism that established motive, and which could have augmented the Government's proof, but which would have been arguably prejudicial.   In the absence of any evidence that could be viewed as unduly prejudice Mr. Khan, the jury chose to believe TFO

Gannon over Mr. Khan's witness.   This Court should not interfere with that credibility determination.

CONCLUSION

For the reasons detailed herein, Mr. Khan's Rule 29 and Rule 33 motions should both be denied.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

/s/

VANESSA RICHARDS
Federal Bar No. phv____
ASSISTANT U.S. ATTORNEY
1000 Lafayette Blvd., 10th Floor
Bridgeport, CT 06604
Tel.: (203) 696-3000

## C E R T I F I C A T I O N

This is to certify that on November 22, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.   Parties may access this filing through the Court's CM/ECF System.

*s/ Vanessa Richards*

VANESSA RICHARDS
ASSISTANT U.S. ATTORNEY